**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.**

REALTOR® ASSOCIATION OF GREATER
FORT LAUDERDALE, INC.,

       Plaintiff,

v.

MIAMI ASSOCIATION OF REALTORS®, INC.,

       Defendant.

_____/

**COMPLAINT**

      Plaintiff, REALTOR®ASSOCIATION OF GREATER FORT LAUDERDALE, INC.,

("Plaintiff" or "RAGFL") sues Defendant MIAMI ASSOCIATION OF REALTORS®, INC.,

("Defendant" or "MAR"), for damages and other relief based on Defendant's false and deceptive

advertising under the Lanham Act, 15 U.S.C. §§ 1117 and 1125 *et seq.*; and for injunctive relief

based on Defendant's violation of the Lanham Act, unfair competition, and violation of §

817.415, *Fla. Stat*.  In support, Plaintiff states:

**NATURE OF CASE**

      1.     Plaintiff ("RAGFL") and Defendant ("MAR") are two REALTOR® associations

located in Broward and Miami-Dade Counties.

      2.     RAGFL brings this case against MAR because MAR has caused loss and injury to

RAGFL through an on-going campaign of false and deceptive advertising by which MAR has

brazenly sought to divert and has diverted real-estate licensees from being members of RAGFL

and injured the good will and reputation of RAGFL.

*Background Summary*

3.      Real estate licensees, including brokers and their agents, have a choice of which local REALTOR® association to join. In any case, they should do so in order to operate and compete effectively in a particular market.

4.      The business of RAGFL and MAR is to provide professional development, dispute resolution services and commercial products and services to their respective members who wish market and sell real estate.

5.      RAGFL and MAR compete directly for members and on the product and service offerings they provide to potential members.  Plaintiff and Defendant also represent their members' commercial interests in Florida and nationwide.

6.      RAGFL and MAR collect dues and monies from their members and in return RAGFL and MAR provide a host of critical services to members for a fee like Multiple Listing Service ("MLS") access (containing proprietary compilations of local real estate sales and critical marketing data) and the professional and technological services they offer to real estate licensees who are members.

7.      RAGFL and MAR have members not only in Florida, but also in several other states.  Both associations have members that have multiple state licenses whereby they conduct business throughout the United States.

8.      No matter where their members reside and/or conduct their business, both RAGFL and MAR are funded by the dues paid by their members and to a larger extent the MLS data services and other products and services they provide their members for a fee.

*Summary Statement of the Injury at Issue*

9.      Upon information and belief, under the leadership of MAR CEO, Teresa King Kinney, as detailed below, MAR has embarked on a gradually escalating campaign of false and deceptive advertising not only touting its own real-estate business offerings, but also drawing direct false comparisons of MAR and RAGFL to the detriment of RAGFL. This campaign has escalated markedly in the weeks preceding the filing of this Complaint and is likely to continue.

10.     Through MAR's false ad campaign, MAR has expressly and impliedly made false and deceptive statements in ads regarding (among many other things) association membership and size; product pricing; and purported member savings for joining MAR versus RAGFL.

11.      MAR's false statements of material fact in advertising have appeared in emails specifically targeted to RAGFL membership; on the internet; in full-page major market newspaper advertising; in promotional market materials distributed in-person in California; and in postcards which MAR caused to be disseminated in Florida and across the United States to RAGFL members and potential MAR members.

12.     Through its false and deceptive advertising and other conduct MAR has brazenly sought to drive and has driven members away from RAGFL and diverted new members from joining RAGFL thereby causing damage to RAGFL.

13.     MAR's false and deceptive advertising has also injured and continues to injure the goodwill and reputation of RAGFL.

14.     MAR's false and deceptive advertising continues to injure RAGFL and will continue to do so unless it is enjoined by this Court.

## PARTIES

15.     Both RAGFL and MAR are professional organizations relating to the real estate profession.

16.     Plaintiff, REALTOR® ASSOCIATION OF GREATER FORT LAUDERDALE, INC., ("Plaintiff" or "RAGFL"), is a Florida corporation.  RAGFL maintains its principal and only office locations in Broward County Florida.

17.     Defendant, MIAMI ASSOCIATION OF REALTOR®, INC., ("Defendant" or "MAR"), is a Florida corporation.  MAR maintains offices in Miami-Dade and Broward County, Florida.  MAR's principal office is in Miami Dade County, Florida.

18.     In terms of number of members, MAR touts that it is the largest local REALTOR® association in the USA.[1]

19.     MAR was created by a merger of two or more REALTOR® associations.  In or about August 2010, the "REALTOR® Association of Greater Miami and the Beaches" and the "REALTOR® Association of Miami-Dade County" announced that their two associations merged to create MAR, allegedly forming the largest REALTOR® association in the nation comprised of 23,000 REALTOR® members.[2]   Shortly thereafter, MAR absorbed the Northwest Dade Association of REALTORS®.

20.     Reference to "Defendant" or "MAR" throughout this Complaint, includes the entity named "MIAMI ASSOCIATION OF REALTORS®, INC.," and its predecessor entities, and the officers, managers, employees, directors, agents, associates, and representatives acting on its behalf and to its financial benefit regarding its REALTOR® association business.

---

[1] http://www.miamire.com/keywords/vision-statement.

[2] http://www.ramdc.com/ramdc/index.cfm/members/news/ramdc-news/ramb-and-ramdc-announce-landmark-merger.

## JURISDICTION AND VENUE

.

21.     This Court has jurisdiction over Plaintiff and Defendant because both are incorporated in Florida and registered with the Florida Secretary of State to do business in Florida; they maintain offices and representatives in this District; and they transact substantial business in this District.   Both parties are corporate citizens of Florida.

22.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 15 U.S.C. § 1117 and 15 U.S.C. § 1125. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because Defendant resides and may be found in this District; Defendant regularly transacts and solicits business in this District; and Defendant has caused the harm alleged in this Complaint to Plaintiff which resides and is principally based in this District, in Broward County, Florida.

24.     At all times material hereto, MAR has maintained offices in Plantation, Florida, in Broward County and offices in Miami Dade County.

25.     MAR's false ads have had an effect on interstate commerce.

26.     RAGFL and MAR have association members residing and conducting business throughout the United States, not just Broward, Miami Dade and Palm Beach Counties.  MAR claims in fact to have an international base of members.  Upon information and belief, MAR's out-of-state members can and do access and purchase the products and services MAR offers them from locations outside the state of Florida.

27.     From MAR's Miami Dade and Broward County offices and through in-person or other communications with RAGFL members located in Broward and Palm Beach Counties and several other states MAR has actively solicited potential association members to transfer their

membership to MAR.  MAR has even created a "Broward Council;" and webpages and websites dedicated to transferees from RAGFL to MAR, including www.getsuprafree.com, www.transfertomiami.com and www.miamire.com/passport. These websites were viewable to RAGFL members and potential MAR members in Florida and other States and abroad.

28.     Moreover, as detailed below, MAR disseminated the false ads at issue to RAGFL members via voluminous emails, website materials, newspaper ads, postcards sent via USPS, and trade show materials.  These false ads were disseminated in Florida and other states, not just to RAGFL members whose principal locations were in Broward, Miami Dade, and Palm Beach Counties.   Upon information and belief, every ad containing false statements mentioned below was sent by MAR to RAGFL members in other states besides Florida.  Also, some of the email blasts MAR initiated and which are discussed below travelled through computer servers housed outside of the United States and outside of Florida.

## SUBSTANTIVE ALLEGATIONS COMMON TO ALL COUNTS

29.     In order to sell real estate in local Florida real estate markets, an individual or entity must hold a valid real estate license.  Real-estate licensees compete for property listings and to represent real property purchasers.  In Florida, among other things, real-estate licensees consist of sales associates, broker associates, and brokers. Certain real estate offices must also maintain real estate licensure.

30.     Under long-standing "Board of Choice" policies and rules of the National Association of REALTORS® ("NAR"), real estate licensees are free to join any local association of their choosing.  However, in order to function and compete effectively for home listings and home buyers in any local market, a real estate licensee should join a local real-estate association like RAGFL and MAR.

31.     REALTOR® associations such as RAGFL and MAR are not by rule or regulation strictly tied to a particular county or city *per se*.  Historically, though, their areas of operations, administration and REALTOR®-related products and services have been tailored to particular geographical markets such as local city, county or a region containing a mixture of contiguous cities and counties.

32.     Today, the market areas of REALTOR® associations like RAGFL and MAR and their members often overlap and involve real estate properties and markets in larger, contiguous geographical areas.

33.     RAGFL and MAR offer competing products and services relating to real properties located in Broward, Miami-Dade and Palm Beach Counties.

34.     The business of RAGFL and MAR is to provide professional development, dispute resolution services, commercial products and services to their respective members who wish to market and sell real estate.  RAGFL and MAR compete directly for members and on the product and service offerings they provide to both current and potential members.  Plaintiff and Defendant also represent their members' commercial interests in Florida and nationwide.

35.     RAGFL and MAR are funded by the dues paid by their members and to a larger extent the MLS data services and products and other services they provide their members for a fee.  The more members a REALTOR® association has—the larger the market share the association in a local market it has—and the more financial resources the association has.

36.     The mix of the services and benefits RAGFL and MAR provide members is similar.  Many of these benefits and services are critical to effective competition in the local real estate market.  These services and benefits include, but are not limited to:

37.   <u>Multiple Listing Service</u> ("MLS") access—MLS can be generally defined as a cooperative venture by which real estate brokers serving a common local market area submit their listings to a central service, which in turn distributes the information, for the purpose of fostering cooperation and establishing offers of compensation for procuring buyers among brokers and agents in real estate transactions. The MLS facilitates transactions by requiring the listing broker to provide a unilateral offer of compensation to cooperating brokers for the procurement of a buyer of their listing, putting together a home seller, who contracts with a broker who is a member of the MLS, with prospective buyers, who may be working with other brokers (a/k/a "cooperating brokers") who are also members of the MLS. Membership in the MLS is largely limited to member brokers who generally must possess a license to engage in real estate brokerage services or appraisal services and meet other criteria set by MLS rules. Although REALTOR® membership is not required for basic MLS access in the Eleventh Circuit (based on *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991)); membership is required in order to obtain full access to all data sets provided by the MLS in order to more effectively compete.

38.   MLS access is critical for a REALTOR® in a given local market and would be material to any decision to join or not join an association: Nearly 100% of homes for sale in a given local market appear in a local MLS data compilation. When MLS-listed homes sell, REALTORS® update the MLS listing with the final sales price. The MLS listing then moves to an archive section of the MLS where appraisers and REALTORS® can access the data to perform a valuation of homes in the area based on recent closing prices. This information is called comparable data. As a matter of competence, nearly all listing agents use comparable data to determine the correct asking price for a home, and buyer representatives use the same data to

determine the correct price to offer for a home. Without access to comparable data, a REALTOR® would be at a severe disadvantage in any local real estate market.

39.     Also, listings and information updates are often mandatory in MLS. Punishments set by the MLS provider's rules can apply when MLS policies and procedures are violated. MLS data compilations and associated software typically have for more powerful search and filter tools than online newspaper listings, REALTOR®.com or the public version of the MLS. Additionally, MLS databases often have rich background information missing from other real estate information sources. MLS data often has closed sale prices and tremendous specific property information allowing real estate licensees and appraisers to compare subject properties with comparable ones that sold recently.

40.     With respect to RAGFL and MAR members, real estate brokers own their respective listings in the MLS of each association. RAGFL and MAR in turn own the compilations of the listings and related data and control and regulate access to their respective MLS data.

41.     RAGFL and MAR charge fees to members for MLS access, which make up a majority of their respective associations' revenue. When a real estate licensee transfers his or her association membership to MAR, the transferee's listings in the RAGFL MLS are transferred to the MAR MLS and are deleted from the RAGFL MLS data and server and are input into MAR's MLS server. Upon such transfer to MAR, RAGFL loses the MLS continuing revenue stream associated with the fees paid for member's MLS listings and other ancillary income.

42.     As set forth below, MAR's false advertising campaign has caused RAGFL to lose a substantial portion of its revenue stream thereby causing damage to RAGFL.

43.   <u>Lockboxes</u>—Lockboxes are mechanical boxes affixed to sellers' front doors, which constitute another critical REALTOR® product and service. A computer key or a mechanical key held by all REALTORS® in a given MLS region will open the lockbox, and inside they will find the key to the front door. A lockbox allows REALTORS® to show a home to a prospective buyer when the owner is not home. Without lockbox access, REALTORS® are effectively barred from the business because they would have a much harder time showing homes to buyers.

44.   Like MLS access, lockbox technology and access are critical for a REALTOR® in a given local market and would be material to any decision to join or not join an association. As set forth below, the lockbox-related system called "SUPRA" has been a focal point in the ad campaign MAR has mounted against RAGFL starting in late August 2011. SUPRA is currently offered by both RAGFL and MAR to their respective members.

45.   <u>Membership</u>—Membership in a local REALTOR® association like RAGFL or MAR is indispensable for a real estate licensee. Associations, including RAGFL and MAR, provide educational resources for members to meet mandatory training requirements; professional networking and development; dispute resolution through a mediation and mandatory arbitration process; access to and guidance on standard business forms such as standard sales agreements; and essential commercial products and services to their respective members who wish to market and sell real estate, not the least of which is MLS access.

46.   The price of and access to REALTOR® association membership and its benefits are critical for a REALTOR® in a given local market and would be material to any decision to join or not join an association.

47.   <u>Other Products and Services</u>: RAGFL or MAR offers several ancillary products and services which enhance their attractiveness to members and would be material to members' decisions to join either association.  Some of these have included, but are not limited to: IMAPP, Realist, ListHub, Proxiopro, Kurio, Showing Assist, Real Biz 360, Live Chat, RCA and Miami Scout.

***MAR's False Advertising Campaign***

48.   At all times material to this Complaint, Defendant has solicited current and potential RAGFL members to transfer to or to become MAR members through ads including false or misleading statements complained of in this suit, which MAR disseminated or caused to be disseminated throughout Florida and in other states nationwide via the internet and USPS.

49.   MAR has embarked on a gradually escalating campaign of false advertising touting its own business and drawing false comparisons of the two associations to the detriment of RAGFL. This campaign has escalated markedly in the weeks preceding the filing of this Complaint and continues to date.  The recent escalation coincided with the distribution of invoices for RAGFL membership dues for RAGFL members. MAR has targeted false ads at RAGFL members in Florida and other states nationwide to dissuade them from continuing with RAGFL membership and to transfer to MAR.

50.   MAR's false ad campaign has been brazen: MAR has expressly made false statements in ads regarding (among many other things) MAR association membership and size in Broward County; product pricing; and purported member savings for joining MAR versus RAGFL. The objective of MAR's false advertising was to induce RAGFL members to leave RAGFL and join MAR.

51.     The media of MAR's false advertising has run the gamut from unsolicited commercial emails, to internet ads to postcards which MAR caused to be disseminated in Florida and other states to RAGFL members and potential MAR members. Some of these solicitations include:

52.     <u>Email</u>: Beginning in January, 2011, MAR sent email to RAGFL members in Florida and in other states, which likely total in the tens of thousands. Some of these emails originated in or travelled through servers in the United Kingdom.

53.     On or about July 21, 2011, MAR sent an unsolicited commercial email to RAGFL members in Florida and in other states which expressly solicited RAGFL members to "Transfer Now" to MAR.  As an inducement to transfer, in the July 21, 2011 email ad MAR  stated among things:



Immediately under this statement, the MAR's email advertisement provided a listing of REALTOR® products and services, which purportedly comprised the "Over $30,000" of "FREE" "Premium Tools" which purportedly were "exclusive" to MAR and "All Free to Miami Members." To underscore the purported savings for transferring to MAR membership, MAR assigned a purported dollar value on each product and service under the rubric, "If purchased separately."  Among other things, this ad listed some the products and services as follows:

*If Purchased Separately*

<u>Exclusive - IMAPP</u>                                 $1680

<u>Exclusive - Realist</u>                                 $1680

| | |
|---|---|
| Exclusive - ProxioPro | $309 |
| Miami-Scout | $299 |
| Exclusive - MongoFax | $1200 |
| Miami RPR REALTOR®S® | $1000 |
| Exclusive – ListingBook | $360 |
| Exclusive – iMapp Prospecting | $99 |
| Exclusive – Realist Prospecting | $99 |
| MIAMI – MLX States Pro | $59 |
| Exclusive – iMapp Gadget | $160 |
| Miami - Kurio | $240 |
| Exclusive i-check | $275 |
| Miami – MLS Advantage | $600 |
| Exclusive AnnounceMyListing.com | save $240/yr. |

………

**Total Savings Per MIAMI Member……….Over $34,500.00**

54.     Reading the July 21, 2011 email ad as a whole, based on the foregoing, MAR has conveyed the following representations and statements in the ad:

a.      That each RAGFL member who transfers his or her membership to MAR will save "Over $34,500;"

b.      That the above-listed are products and services are available for purchase separately;

c.      That the above-listed are products and services are available for purchase separately at the dollar values provided; and,

13

d.      That with respective the products and services MAR has identified by the adjective "Exclusive," MAR possessed and is an exclusive provider of such services.

55.     The above-identified advertising statements contained in the MAR July 21, 2011 email advertisement set forth in the preceding paragraphs 53-54 are material because they would likely affect a member's choice to purchase a MAR membership and to transfer from RAGFL to MAR.

56.     The above-identified advertising statements contained in the MAR July 21, 2011 email advertisement set forth in the paragraphs 53-54 are expressly or by implication false, because at the time the they were disseminated:

a.      MAR did not exclusively possess and offer: IMAPP, Realist, ProxioPro, MongoFax, ListingBook, iMapp Prospecting, Realist Prospecting, iMapp Gadget, i-check, and AnnounceMyListing—all of these products or services were at the time provided by RAGFL or other associations in Broward and/or Palm Beach Counties;

b.      The following products and services could not be purchased separately and/or the dollar values MAR assigned them were created by MAR not the vendor of the product or service: IMAPP, Realist, ProxioPro, Miami Scout, Miami RPR, ListingBook, iMapp Prospecting, Realist Prospecting, MLX Stats Pro, Kurio, MLS Advantage, and iMapp Gadget; and,

c.       Each RAGFL member who transferred his or her membership to MAR would not save "Over $34,500"—MAR created the line-item dollar values making up the "$34,500" litany of products and services to make it appear that members would reap substantial savings when such was not the case.

14

57.     On or about early August, 2011, MAR's established two new bulk email accounts with Contactology and North-Carolina-headquartered iContact.  MAR utilized Contactology for bulk email distribution to MAR membership.  MAR setup the iContact bulk email account under the name of Broward Council of the Miami Association of REALTORS®.

58.     On or about late August, 2011, MAR caused to be sent emails utilizing their iContact account to RAGFL membership.  iContact subsequently suspended and ultimately terminated MAR's account for MAR's violation of iContact's Terms of Use by MAR's sending unsolicited commercial emails to RAGFL membership without the recipient's consent.

59.     On or about early October, 2011, MAR established a new bulk email account with a provider located in the United Kingdom, DotMailer.   DotMailer immediately suspended and ultimately terminated MAR's account for violations of DotMailer's policies.

60.     Postcard Ads: Beginning in August, 2011, MAR began the postcard component of its campaign by mass mailings of post card advertising to RAGFL members via USPS in Florida and to other states in the United States.

61.     On or about August 24, 2011, MAR caused the dissemination of post cards to RAGFL members in Florida and in other states to induce them to transfer their memberships to MAR.  As an inducement to transfer, in this postcard, MAR stated among things that:

     a.     Transferees would "Get SUPRA Free" and directed RAGFL members to MAR's website "GetSuprafree.com;" and,

     b.     "Lockboxes will be required on all properties for Fannie Mae, HUD, BOA."

62.     The above statement regarding "Fannie Mae, HUD, BOA" was positioned directly below the statement: "SUPRA is now free."

63.     Reading the MAR August 24, 2011 postcard ad as a whole, based on the foregoing, MAR has conveyed the following representations and statements in the ad:

a.      MAR is unconditionally offering and providing the SUPRA product and service free without any payment or consideration of any kind; and,

b.      Fannie Mae, HUD, and BOA will require lockboxes.

64.     The foregoing advertising statements in the MAR August 24, 2011 postcard set forth in the preceding paragraphs 61-63 were material because they would likely affect a member's choice to purchase a MAR membership and to transfer from RAGFL to MAR.

65.     The above-identified advertising statements contained in the MAR August 24, 2011 postcard advertisement set forth in the paragraphs 61-63 are expressly or by implication false because, at the time the they were disseminated:

a.      MAR was going to charge (and has subsequently charged) members for SUPRA; and,

b.      Fannie Mae, HUD, and BOA were not going to and had never required lockboxes.

66.     On or about September 15, 2011, MAR caused the dissemination of another post card ad to RAGFL members in Florida and in other states to induce them to transfer their memberships to MAR.  As an inducement to transfer, in this postcard MAR stated among things that:

a.      Transferees would "Get SUPRA Free" and directed RAGFL members to MAR's website "GetSuprafree.com;"

b.      "Did you know we have…. 5100 members in Broward County and growing…;"

c.      "Before you pay any [RAGFL membership] invoice…Did you know you can transfer now – and still pay less!"; and,

d.      "Miami Full Year $611 with Free SUPRA versus RAGFL $641 without free SUPRA."

67.      Reading the foregoing MAR September 15, 2011 postcard ad as a whole, based on the foregoing, MAR has conveyed the following representations and statements in the ad:

a.      MAR is unconditionally offering and providing the SUPRA product and service free without any payment or consideration of any kind;

b.      MAR Broward County members are 5100 and growing; and,

c.      MAR's annual fees and dues are $611 with Free SUPRA while RAGFL's cost $641 without free SUPRA.

68.      The foregoing advertising statements in the MAR September 15, 2011 postcard ad set forth in the preceding paragraphs 66-67 were material because they would likely affect a member's choice to purchase a MAR membership and to transfer from RAGFL to MAR.

69.      The above-identified advertising statements contained in the MAR September 15, 2011 postcard advertisement set forth in the paragraphs 66-67 are expressly or by implication false because, at the time the they were disseminated:

a.      MAR was going to charge (and has subsequently charged) members for SUPRA;

b.      The number of MAR's Broward County members did not total 5100—there were significantly fewer MAR Broward County members than this total indicates; and,

c.      MAR's annual fees and dues were not $611 with Free SUPRA.

70.      On or about early October, 2011, MAR caused the dissemination of another post card ad to RAGFL members to induce them to transfer their memberships to MAR.  This post card coincided with RAGFL's mailing of its member dues and fee invoices to members.  The post card was sent to RAGFL members in Broward County, Florida *and* to the addresses of

RAGFL members in other states.  This post card ad warned RAGFL members to "Stop."  In this

postcard, MAR also stated among things that:

      a.      "Why pay More for your Dues, get less services [sic] and still not "Get SUPRA

Free;"

      b.      "5600 Members in Broward County…and growing;

      c.      (see insert, next page)



71. Reading the in the foregoing MAR early October, 2011 postcard ad as a whole, based on the foregoing, MAR has conveyed the following representations and statements in the ad:

a. MAR is unconditionally offering and providing the SUPRA product and service free without any payment or consideration of any kind;

b. MAR Broward County members are 5600 and growing;

c. RAGFL requires members to pay $35 for education while MAR does not, which makes RAGFL member pay more for association membership;

d. RAGFL charges members for SUPRA while MAR does not;

e. RAGFL's dues and fees are $460;

f. MAR's annual dues and fees total $405 and include "SUPRA FREE;" and,

g. Transferees from RAGFL to MAR will receive over "$33,000 in Premium Marketing Tools."

72. The foregoing advertising statements in the MAR early October, 2011 postcard ad set forth in the preceding paragraphs 70-71 were material because they would likely affect a member's choice to purchase a MAR membership and to transfer from RAGFL to MAR.

73. The above-identified advertising statements contained in the MAR early October, 2011 postcard advertisement set forth in the paragraphs 70-71 are expressly or by implication false because, at the time the they were disseminated:

a. MAR was going to charge (and has subsequently charged) members for SUPRA—thus, any price comparison which included SUPRA in RAGFL's fees but not MAR's was false;;

b.      The number of MAR's Broward County members did not total 5600—there were significantly fewer MAR Broward County members than this total indicates;

c.      RAGFL did not require members to pay $35 for education;

d.      RAGFL's dues and fees were not $460—MAR failed to disclose the time frame for the stated RAGFL dues and fees (including whether they were calculated on an annual basis or otherwise) and whether or not the $460 was unconditionally the sole membership dues amount—in truth and in fact, the regular RAGFL membership discounted net dues and fees at the time the ad was disseminated were $360 for renewing members and currently remain at $360 for new RAGFL membership, not $460; and,

e.      Transferees from RAGFL to MAR will not receive over "$33,000 in Premium Marketing Tools"—MAR created the line-item dollar values making up the "$30,000" litany of products and services to make it appear that members would reap substantial savings when in truth and in fact the products and services making up this dollar figure were among other things: obtained for free from various vendors; or not quantifiable on a per member basis because they could not be purchased separately.

74.      On or about mid October 2011, MAR caused the dissemination of another post card ad to RAGFL members to induce them to transfer their memberships to MAR.  This post card coincided with RAGFL's mailing of its member dues and fee invoices to members.  The post card was sent to RAGFL members in Broward County, Florida *and* on information and belief to the addresses of RAGFL members in other states nationwide.  In this postcard, MAR stated among things, that:

a.



b.



75.     Reading the in the foregoing MAR mid-October, 2011 postcard ad as a whole, based on the foregoing, MAR has conveyed the following representations and statements in the ad:

a.      MAR is unconditionally offering and providing the SUPRA product and service free without any payment or consideration of any kind;

b.      MAR's Broward County members are 5700 and "growing everyday" [sic];

c.      RAGFL requires members to pay $35 for education while MAR does not, which makes RAGFL member pay more for association membership;

d.      RAGFL charges members for SUPRA while MAR does not;

22

e.      RAGFL's dues and fees are $460, which are more than MAR's;

f.      Approximately 700 RAGFL members "have just transferred" to MAR:

g.      MAR's annual dues and fees total $405 and include "SUPRA FREE;"

h.      Transferees from RAGFL to MAR will receive over "$33,000 in Premium Marketing Tools;" and,

i.      RAGFL members pay more for their association memberships than do MAR's.

76.     The foregoing advertising statements in the MAR mid-October, 2011 postcard ad set forth in the preceding paragraphs 74-75 were material because they would likely affect a member's choice to purchase a MAR membership and to transfer from RAGFL to MAR.

77.     The above-identified advertising statements contained in the MAR early October, 2011 postcard advertisement set forth in the paragraphs 74-75 are expressly or by implication false because, at the time the they were disseminated:

a.      MAR was going to charge (and has subsequently charged) members for SUPRA—thus, any price comparison which included SUPRA in RAGFL's fees but not MAR's was false;

b.      The number of MAR's Broward County members did not total 5700—there were significantly fewer MAR Broward County members than this total indicates;

c.      RAGFL did not require members to pay $35 for education;

d.      700 RAGFL members had not transferred to MAR;

e.      RAGFL's dues and fees were not $460—MAR failed to disclose the time frame for the stated RAGFL dues and fees (including whether they were calculated on an annual basis or otherwise) and whether or not the $460 was unconditionally the sole membership dues amount—in truth and in fact, the regular RAGFL membership discounted net dues and fees at

23

the time the ad was disseminated were $360 for renewing members and currently remain at $360 for new RAGFL membership, not $460;

      f.      Transferees from RAGFL to MAR will not receive over "$33,000 in Premium Marketing Tools"—MAR created the line-item dollar values making up the "$33,000" litany of products and services to make it appear that members would reap substantial savings when in truth and in fact the products and services making up this dollar figure were among other things: obtained for free from various vendors; or not quantifiable on a per member basis because they could not be purchased separately; and,

      g.      At the time the post card ad was disseminated, not all RAGFL members paid more for their memberships than did MAR's.

      78.      <u>Newspaper Ads</u>: Among other ads, on or about October 9, 2011, ran a newspaper advertisement in the Sun Sentinel whose circulation reaches locations in Florida and other states nationwide.  In this ad, MAR made essentially the same representations and statements identified above, including, that:

      a.      MAR is unconditionally offering and providing the SUPRA product and service free without any payment or consideration of any kind;

      b.      RAGFL requires members to pay $35 for education while MAR does not, which makes RAGFL member pay more for association membership;

      c.      RAGFL charges members for SUPRA while MAR does not;

      d.      RAGFL's dues and fees are $460, which are more than MAR's;

      e.      MAR's annual dues and fees total $405 and include "SUPRA FREE;"

      f.      Transferees from RAGFL to MAR will receive over "$33,000 in Premium Marketing Tools;" and,

g.       RAGFL members pay more for their association memberships than do MAR's.

79.     The foregoing advertising statements in the MAR October 9, 2011 Sun Sentinel ad set forth in the preceding paragraph 78 were material because they would likely affect a member's choice to purchase a MAR membership and to transfer from RAGFL to MAR.

80.     As with the other ads identified above, the advertising statements contained in the foregoing advertising statements in the MAR October 9, 2011 Sun Sentinel ad set forth in paragraph 78 are expressly or by implication false because, at the time the they were disseminated:

a.       MAR was going to charge (and has subsequently) charged members for SUPRA—thus, any price comparison which included SUPRA in RAGFL's fees but not MAR's was false;

b.       RAGFL did not require members to pay $35 for education;

c.       RAGFL's dues and fees were not $460—MAR failed to disclose the time frame for the stated RAGFL dues and fees (including whether they were calculated on an annual basis or otherwise) and whether or not the $460 was unconditionally the sole membership dues amount—in truth and in fact, the regular RAGFL membership discounted net dues and fees at the time the ad was disseminated were $360 for renewing members and currently remain at $360 for new RAGFL membership, not $460;

d.       Transferees from RAGFL to MAR will not receive over "$33,000 in Premium Marketing Tools"—MAR created the line-item dollar values making up the "$30,000" litany of products and services to make it appear that members would reap substantial savings when in truth and in fact the products and services making up this dollar figure were among other things:

obtained for free from various vendors; or not quantifiable on a per member basis because they could not be purchased separately; and,

    e.    At the time the post card ad was disseminated, currently renewing and/or newly joining RAGFL members did not pay more for their memberships than did MAR's.

    81.    <u>Internet Sites and Postings</u>: Among other ads, since at least October 2011, MAR has also conducted a major portion of its false ad campaign through internet sites.  Through its websites and Facebook posts MAR has published false statements in ads not only to Broward County-based REALTOR®s, but also to those in other states.  The sites where MAR's false statements have appeared were in fact not limited to RAGFL members.  Any prospective REALTOR® in fact could have viewed MAR's advertising on the web including MAR's "Broward Council" Facebook Wall which included falsely inflated Broward membership numbers in order to falsely portray MAR as the soon-to-be "largest REALTOR® Association in Broward County."  The MAR web advertising at issue has appeared on the web at: CEO Kinney's Facebook Wall, the Facebook Wall of MAR's "Broward Concil," [www.getsuprafree.com](http://www.getsuprafree.com), [www.transfertomiami.com](http://www.transfertomiami.com) and [www.miamire.com/passport.](http://www.miamire.com/passport)

    82.    On December 5, 2011, MAR caused an ad to appear on MAR's "Broward Council" Facebook Wall containing the following advertising statement: "Did you know that we currently have 5,985 members in Broward County? That's right! This explosive growth is positioning us to become the largest REALTOR® Association in Broward County!!! We thank all our dedicated members & Board of Governors for spreading the word to your peers about our great products, services & unmatched customer service!"

83.     In the foregoing December 5, 2011 "Broward Counsel" Facebook Wall posting, MAR made the following representations and statements: MAR had 5,985 members in Broward County and was growing.

84.     The foregoing advertising statements in the MAR December 5, 2011 "Broward Counsel" Facebook Wall posting ad set forth in paragraphs 82-83 were material because they would likely affect a member's choice to purchase a MAR membership and to transfer from RAGFL to MAR. An alleged large membership transfer rate from one association to the other also conveys the statement to members that the association to which members are transferring is offering superior services and benefits to its members.

85.     The above-identified advertising statements contained in the MAR December 5, 2011 "Broward Counsel" Facebook Wall posting ad set forth in the paragraphs 82-83 are expressly or by implication false because, at the time the they were disseminated MAR did not have 5,985 members in Broward—there were significantly fewer MAR Broward County members than this total indicates.

86.     On December 8, 2011, MAR caused a posting to appear on their "Broward Council" Facebook Wall containing the following advertising statement: "A MAJOR milestone today: Broward Council now has over 6,000 members! That's 6,029 to be exact...MIAMI Members in Broward! Congratulations Broward!"

87.     In the foregoing December 8, 2011 "Broward Counsel" Facebook Wall posting, MAR made the following representations and statements: MAR had 6,029 members in Broward County.

88.     The foregoing advertising statements in the MAR December 8, 2011 "Broward Counsel" Facebook Wall posting ad set forth in paragraphs 86-87 were material because they

would likely affect a member's choice to purchase a MAR membership and to transfer from RAGFL to MAR.

89.     The above-identified advertising statements contained in the MAR December 8, 2011 "Broward Counsel" Facebook Wall posting ad set forth in the paragraphs 86-87 are expressly or by implication false because, at the time the they were disseminated MAR did not have 6,029 members in Broward County—there were significantly fewer MAR Broward County members than this total indicates.

90.     Similarly, the Facebook postings of the "Broward Council" of MAR throughout October and November, 2011, have regularly included photos of tabulations of purported RAGFL members who have switched their memberships to MAR. Each of these tabulations purportedly showed numbers of MAR's Broward County members.  The purported increasing numbers in the tabulations were material in that they would likely affect a member's choice to purchase a MAR membership and to transfer from RAGFL to MAR.  An alleged large membership transfer rate from one association to the other also conveys the statement to members that the association to which members are transferring is offering superior services and benefits to its members.  As before, however, every membership tabulation has been inflated and thus false—there were significantly fewer MAR Broward County members than the tabulation totals indicate.

91.     As recently as December 3, 2011, at 12:32 PM, www.transfertomiami.com was accessed and on that site, at that time, MAR continued to make the material false statements in its ads that potential MAR members could "Get SUPRA Free" when such was not the case. MAR also material statement in the web ad that potential members would receive "$31,000 in Premium Marketing Tools" when such was not the case.

28

92.     Moreover, in her Facebook Wall, MAR's CEO Teresa King Kinney, stated on October 13, 2011, in an internet posting, the following: "Since GET SUPRA FREE launched 44 days ago...613 new members have transferred [sic] to MIAMI. Why would you pay more for your dues, get less services and still not GET SUPRA FREE? Find out why 613 made the move in just 44 days: http://www.miamire.com/passport."

93.     The foregoing October 13, 2011 Facebook posting expressly makes the material statement, consistent with the above ads, that SUPRA was free, when in truth an in fact, such was not the case. MAR was going to charge (and has subsequently) charged members for SUPRA.

94.     Again, as with the previous similar representations, the foregoing representations on the internet are material in that they would likely affect a member's decision whether or not to leave RAGFL to become a MAR member. The foregoing internet postings were available for the entire world to view.

95.     <u>Trade Association Materials</u>: On November 11, 12 and 13, 2011, MAR maintained a fully staffed and operational promotional booth at the NAR[3] Annual Convention in Anaheim, California.  MAR staff, including Deborah Boza-Valledor, MAR's Chief Marketing Officer, and Paul Cauchi, Senior VP of Commercial for MAR, were present and disseminating various MAR membership marketing materials containing much of the false advertising as contained throughout this instant Complaint, including the material false statement that a prospective member would in fact "Get SUPRA Free;" and those material false statements or very similar ones identified in paragraphs 52-55 above.

***MAR's False Ads and Tactics Have Injured RAGFL***

---

[3]     "NAR" is an acronym for the "National Association of REALTORS®."

96.     As detailed above, MAR has embarked on a gradually escalating campaign of false advertising disseminated to RAGFL members in Florida and other states nationwide not only touting MAR's own real-estate business offerings, but also drawing false comparisons of the two associations to the detriment of RAGFL. This campaign has escalated markedly in the weeks preceding the filing of this Complaint, continues to date, and has coincided with a marked increase of members transferring from RAGFL to MAR.

97.     Upon information and belief, MAR has also:

a.      Transferred the MLS access and listings of real-estate licensees who were RAGFL members to MAR's MLS database without the licensee's knowledge or consent; and,

b.      Solicited and received passcodes to RAGFL's MLS, which violates RAGFL's agreements for MLS use by real-estate licensee members.

98.     RAGFL members have brought one or more of the foregoing MAR's ads to the attention of MAR's CEO and board members, which included false statements of fact; however, MAR has continued to disseminate ads containing the false statements and representations and continued to engage in the misconduct alleged above.

99.     Through the foregoing false advertising and other conduct MAR has blatantly sought to drive and has driven members away from RAGFL and diverted new members from joining RAGFL thereby causing damage to RAGFL.  Membership fees and MLS fees are RAGFL's two major sources of revenue.  The foregoing false ads have thereby directly caused RAGFL to suffer monetary losses in the form of damages and loss of these primary revenue streams. RAGFL members have an average active membership for approximately 8 years and any diversion or transfer from RAGFL to MAR constitutes a loss of that revenue stream.

100.    Concurrently, as a direct result of its false ads, MAR has profited by the transfer or diversion of RAGFL members or prospective members.

101.    MAR's false advertising has also injured and continues to injure the goodwill and reputation of RAGFL, which was founded in Broward County in 1922 and has an enjoyed a substantial and respected presence throughout South Florida and the REALTOR® community nationwide. This goodwill and reputation have attracted members to RAGFL who are now being diverted to MAR by reason of MAR's false advertising stated above.

102.    MAR's false advertising continues and will continue unless enjoined by this Court.

**COUNT I**
**FALSE AND DECEPTIVEADVERTISING**
**Violation of 15 U.S.C. § 1125(a)**

103.    Plaintiff hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

104.    RAGFL and MAR are competitors which compete directly for members and on the product and service offerings they provide to potential members relating to real estate sales in the Miami Dade, Broward and Palm Beach Counties. Plaintiff and Defendant also represent their members' commercial interests in Florida and nationwide.

105.    The Lanham Act, under 15 U.S.C. § 1125(a)(1)(B), provides, in pertinent part, "Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any…false or misleading description of fact, or false or misleading representation of fact, which…in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or

commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

106.    MAR is a "person" within the meaning of the Lanham Act.

107.    As set forth above, MAR has caused the dissemination of commercial advertising or promotion in connection with its goods or services and those of RAGFL.  That advertising was not only solicited sales of MAR products and services, but also advanced MAR's business interests to the detriment of RAGFL's interests.

108.    MAR's commercial advertising or promotion has contained literally false statements and representations of fact and/or statements and representations which implicitly convey a false impression, are misleading in context, or likely to deceive consumers.

109.    MAR's false and/or misleading advertising statements misrepresented the nature, characteristics, and qualities of MAR's and RAGFL's goods, services, or commercial activities.

110.    MAR's false and/or misleading statements in advertising were made in or had an effect on interstate commerce.

111.    MAR's advertising statements and representations alleged above were literally false and thus presumptively deceptive; or MAR's advertising statements and representations were actually deceptive to the targeted audience or had the tendency to deceive the targeted audience.

112.    MAR's statements and representations in advertising alleged above were material in that they were likely to influence purchasing decisions of the targeted audience.

113.    MAR's false or misleading statements and representations in advertising have directly and proximately caused RAGFL to lose sales of memberships and member-related fees and thereby suffer damage and loss of revenue; and directly and proximately caused RAGFL to

lose profits and revenue from RAGFL's MLS offerings to members and potential members. Concurrently, as a direct result of its false ads, MAR has profited by the transfer or diversion of RAGFL members or prospective members.

114.    MAR's false or misleading statements and representations in advertising have also injured or are likely to injure the good will and reputation of RAGFL.

115.    MAR willfully and deliberately made the foregoing false or misleading statements and representations in advertising or made such statements in bad faith.

116.    WHEREFORE, Plaintiff requests that this Court enter judgment against Defendant for the following:

a.   Any damages suffered by RAGFL by reason of MAR's false advertising;

b.   Treble damages pursuant to 15 U.S.C. § 1117;

c.   All profits and revenues MAR derived from the false advertising or such sums as the Court shall find to be just, according to the circumstances of the case;

d.   Reasonable attorneys' fees and costs;

e.   Pre-judgment and post-judgment interest;

f.   A temporary and permanent injunction; and,

g.   Such other and further relief as the Court may deem necessary or appropriate.


## COUNT II
## INJUNCTIVE RELIEF

117.    Plaintiff hereby incorporates paragraphs 1-115 by reference as though fully set forth herein and further allege as follows:

118.    The Lanham Act creates statutory and legal duties for Defendant which it owes to Plaintiff, and the Lanham Act creates legal rights for Plaintiff.

119.    The Lanham Act, under 15 U.S.C. § 1125(a)(1)(B), imposes on Defendant a duty not to engage false or misleading advertising and unfair competition resulting therefrom.  As set forth above, Defendant has violated that duty, injured Plaintiff, and violated one or more cognizable legal rights Plaintiff possesses.

120.    Moreover, either concurrently or alternatively, § 817. 415, *Fla. Stat*., imposes on Defendant a duty not to offer a service as "free" unless it is in fact free and all conditions on the offer are disclosed. This statute creates a right in Plaintiff.

121.    Defendant's offers of "free" SUPRA identified throughout this Complaint either concurrently or alternatively violate Defendant's duties under § 817. 415, *Fla. Stat*., because under that statute Defendant cannot offer a service unconditionally as "free" and require a consumer to incur a financial obligation as a condition of taking advantage of the free service; and in this same vein, under § 817. 415, *Fla. Stat*., Defendant cannot conditionally offer SUPRA as "free" unless Defendant in its offer of  "free" SUPRA, Defendant clearly and conspicuously states all conditions necessary to receive the "free" SUPRA.  A violation of § 817. 415, *Fla. Stat*., is a deceptive trade practice. Section 817.417 (6), *Fla. Stat*., states that "[a]ny violation of this section is declared to be a deceptive trade practice and unlawful."

122.    Also, concurrently or alternatively, Florida common law creates legal duties and rights in competitors.  As set forth above, RAGFL and MAR compete for a common pool of customers. Florida common law imposes on MAR a duty not to harm a competitor through fraudulent or deceptive conduct which would likely cause consumer confusion.

123.    As set forth above, MAR, through its false statements of material facts in ads, has concurrently or alternatively engaged in unfair competition where those statements and ads were deceptive and likely to cause confusion among the targets of the ads.  Through such unfair

34

competition MAR has harmed RAGFL.  MAR has thereby violated its duty not to engage in unfair competition and harmed RAGFL.

124.    Defendant continues on a course of violating one or more of its statutory and common law duties set forth above and Plaintiff will likely prevail in showing one or more of these violations.

125.    Plaintiff has no fully adequate remedy at law by virtue of Defendant's on-going course of conduct.

126.    Irreparable injury to Plaintiff has and will be suffered unless an injunction issues to prevent Defendant from continuing on the foregoing course of conduct, including its false ads, which if unabated will continue to cause or are likely to cause diversion of members from RAGFL to MAR and to injure Plaintiff's good will and reputation.

127.    Any potential injury to the Defendant attributable to an injunction to enjoin the conduct alleged above is outweighed by the injury that Plaintiff and the public will suffer if such injunction is not issued, and such injunction would not be adverse to the public interest.

128.    WHEREFORE, Plaintiff prays for a temporary and permanent injunction:

a.  Enjoining the Defendant as set forth in Plaintiff's subsequent motion for injunction or as requested at trial;

b.  Awarding reasonable costs and attorney's fees; and

c.  Awarding such other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.


DATED: December 20, 2011

                                        Respectfully submitted,

**FARMER, JAFFE, WEISSING,**
**EDWARDS, FISTOS & LEHRMAN, P.L.**

By:_____/s/ Steven R. Jaffe_____
Steven R. Jaffe
FBN 390770
Mark S. Fistos
FBN 909191
425 N. Andrews Ave., Suite 2
Fort Lauderdale, Florida 33301
Telephone 954-524-2820
Facsimile 954-524-2822
steve@pathtojustice.com
mark@pathtojustice.com

Stephen J. Simmons, Esq.
FBN 664375
Murray & Simmons, LLP
1401 East Broward Blvd., Suite 200
Fort Lauderdale, FL 33301
Telephone (954) 467-2000
Facsimile (954) 467-2306
sjs@mslaw.net

**Attorneys for Plaintiff**